**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANGEL RUNCIMAN, individually, on behalf of the Amended and Restated Savings Fund Plan for Employees of 84 Lumber Company, and on behalf of all others similarly situated, | **CIVIL ACTION NO: 2:24-cv-852** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| 84 LUMBER COMPANY, ADMINISTRATIVE COMMITTEE of the Amended and Restated Savings Fund Plan for Employees of 84 Lumber Company, JOHN DOES 1-30 in their capacities as members of the Administrative Committee, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Angel Runciman ("Plaintiff"), individually, on behalf of the Amended and Restated Savings Fund Plan for Employees of 84 Lumber Company (the "Plan")[1], and as representative of the Class described below, by and through her attorneys, states and alleges as follows:

### I.      INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA") against the fiduciaries of the Plan for

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

breaching their duties under ERISA to the participants and beneficiaries of the Plan (collectively, "participants") during the Class Period.[2]

2.      As set forth below, the Defendant fiduciaries have wasted millions of dollars of the participants' money and must be held accountable for the substantial losses suffered by the Plan and its participants.

3.      Prior to filing suit, pursuant to ERISA §104(b), Plaintiff requested copies of the Defendants' quarterly monitoring reviews and reports, and additional documents, including contracts and fee disclosures pertaining to the operation of the Plan, but 84 Lumber Company refused to provide many of the requested documents. Accordingly, as this litigation proceeds, this Court should preclude Defendants from attempting to rely upon any such documents or the information contained in such documents to the extent they pertain to the operation of the Plan.

## II.      BACKGROUND

4.      Defined contribution plans, which are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (*i.e.*, 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner by which the employees bear the risk of high fees and investment under-performance.

5.      Most employees contributing to 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. Accordingly, it is imperative that plan

---

[2] The Class Period, as will be discussed in more detail below, commences six (6) years back from the date of the filing of this Complaint through the date of judgment.

fiduciaries act prudently at all times to ensure that plan participants do not suffer losses due to inappropriate investment options being provided by the plan or monies in the plan being wasted on unreasonable fees and expenses.

6.      Employees who participate in 401(k) plans are limited to investing their hard-earned wages in the investment options made available under the plan. The monies invested in the plan belong to the employees. Accordingly, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers who sponsor 401(k) plans and the fiduciaries who manage and oversee the plans.

7.      At all relevant times, Defendants were fiduciaries to the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

8.      As fiduciaries, Defendants were obligated to act prudently and for the exclusive benefit of participants of the Plan. These fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (*en banc*).

9.      Employers, as sponsors and fiduciaries of plans, are permitted to designate additional fiduciaries to manage and control the plan, including reviewing and determining which investment options will be made available to plan participants.

10.     Under ERISA, fiduciaries with the power to appoint other fiduciaries have the concomitant fiduciary duty to monitor and supervise their appointees.

11.     ERISA adheres to the principles of trust law with respect to the management and operation of 401(k) plans. Accordingly, at all relevant times, Defendants were obligated to comply with the Restatement (Third) of Trusts ("Restatement").

12.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (en banc) ("*Tibble II*"), (quoting Restatement (Third) of Trusts, § 90, cmt. b).

13.    Pennsylvania, and nearly every other state, has adopted the Uniform Prudent Investor Act (the "UPIA"). The Restatement also has adopted the UPIA. The UPIA codifies the Prudent Investor Rule, which serves as a standard of conduct for financial fiduciaries.

14.    Wasting the trust's (Plan's) money (i.e., participants/beneficiaries' salary savings) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1). In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7.

15.    The Department of Labor ("DOL") administers and enforces the provisions of ERISA. The DOL has instructed: "Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries." *See* U.S. Dep't of Labor, "A Look at 401(k) Plan Fees", (Aug. 2013), at 2.[3]

16.    Among other things, the DOL advises employees that their employers have "a specific obligation to consider the fees and expenses paid by [their] plan" because the "fees and expenses paid by [their] plan may substantially reduce the growth in [their] account which will reduce [their] retirement income." *Id*.  The DOL further instructs that "employers must: [e]stablish a prudent process for selecting investment options and service providers; [and] [e]nsure that fees paid to service providers and other plan expenses are reasonable." *Id*.

17.    In addition, employers and other retirement plan fiduciaries must "monitor investment options and service providers once selected to see that they continue to be appropriate

---

[3] Available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/ publications/a-look-at-401k-plan-fees.pdf (last visited Feb. 25, 2024).

choices." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (expressly reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

18.     Prudent and impartial plan sponsors and other fiduciaries must monitor both the performance and cost of the investments selected for their 401(k) plans, as well as investigate alternatives in the marketplace, to ensure that well-performing, low cost investment options are being made available to plan participants at all times and that no plan assets are being wasted on unnecessary and/or unreasonable fees and expenses.

19.     "Beneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

20.     As set forth herein, during the Class Period, Defendants have breached the duties they owed to the Plaintiff, the Plan and all of the Plan participants.

21.     Among other things, the Defendants: (1) failed to implement and follow a prudent process for evaluating, selecting, monitoring and replacing funds in the Plan to ensure that each investment option in the Plan was prudent; (2) maintained unreasonably expensive and/or underperforming share classes of funds and investment options in the Plan despite the availability of lower-priced share classes and investment options containing identical or equivalent investments with lower costs and and/or better performance; (3) failed to control the Plan's administrative and recordkeeping costs; (4) unreasonably funded a "Plan Expense Account" ("PEA") with assets taken from participants' accounts via revenue sharing agreements with third parties which benefited Defendants and third parties at the expense of the participants; (5) allowed third parties,

such as the Plan recordkeeper to keep "float income" as well as investment earnings on the monies

in the PEA; and (6) otherwise have wasted assets of the Plan and failed to act in the best interests

of the Plan's participants.

22.     Defendants' acts and omissions in managing the Plan constitute a breach of their

fiduciary duties in violation of 29 U.S.C. § 1104.

23.      Defendants' actions were contrary to the actions of a reasonable fiduciary and

resulted in the Plan and its participants losing many millions of dollars.

24.     Plaintiff brings this action to obtain relief under ERISA § 409, 29 U.S.C. § 1109,

for losses suffered by the Plan resulting from the Defendants' fiduciary breaches described below,

and to obtain other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C.

U.S.C. § 1102(a)(3).

### III.     JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 because it is a civil action arising under the laws of the United States, and pursuant to 29

U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of

ERISA, 29 U.S.C. § 1001, *et seq*.

26.     This Court has personal jurisdiction over Defendants because they transact business

in this District, reside in this District, and/or have significant contacts with this District, and

because ERISA permits nationwide service of process.

27.     Venue is proper in this judicial district pursuant to ERISA § 502(e), 29 U.S.C. §

1132(e)(2), because some or all of the violations of ERISA occurred in this District, and

Defendants reside and may be found in this District. Venue is also proper in this District pursuant

to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## IV.    THE PLAN

28.    The Plan is a Single Employer 401(k) plan which filed its most recent 5500 in October 2023.  At that time, the Plan reported $518,710,871 in assets and 9,433 total participants with account balances.

29.    The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401.

## V.    THE PARTIES

### A.  PLAINTIFF

30.    Plaintiff Angel Runciman resides in Indiana. At all times relevant hereto, Plaintiff has been an employee of the Company and a participant in the Plan as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

31.    During the Class Period, Plaintiff invested in, among other funds, the T. Rowe Price 2040 target date fund. Since at least 2023, Plaintiff also has had her savings allocated pursuant to Empower's GoalMaker service, pursuant to which her savings are invested in up to 10 or more funds in the Plan. In conjunction with the asset allocation automatically performed by GoalMaker, Plaintiff has had assets invested in the Principal Preservation Separate Account, which is the stable value fund selected by the Defendants for the Plan.

32.    As a result of the Defendants' mismanagement of the Plan and violations of ERISA, Plaintiff and the other Plan participants have been subjected to excessive costs, fees and fund underperformance and, as such, have suffered financial losses.

33.    Plaintiff has standing to bring this action on behalf of the Plan because she participates in the Plan and has suffered losses due to Defendants' failure to comply with their obligations under ERISA.

34.    Plaintiff did not have knowledge of the material facts giving rise to her claims prior to her participation in this lawsuit.

**B. DEFENDANTS**

35.    Defendant, 84 Lumber Company ("Company"), is Plaintiff's employer and the sponsor of the Plan.

36.    Defendant Company is a Pennsylvania corporation with headquarters and a principal place of business in Eighty Four, PA.

37.    At all relevant times, the Company was the Plan administrator under ERISA § 3(16), 29 U.S.C. § 1002(16), a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), exercising discretionary authority and control over the management of the Plan and management and disposition of Plan assets.

38.    Defendant Company, acting through its Board of Directors, directly controlled and managed the operation and administration of the Plan and/or appointed the Administrative Committee of the Amended and Restated Savings Fund Plan for Employees of 84 Lumber Company ("Committee") to control and manage the operation and the administration of the Plan in compliance with ERISA and the Investment Policy Statement governing the Plan. Company and the Committee had a concomitant fiduciary duty to prudently select, monitor and supervise any fiduciary appointees/delegates.

39.     Defendant "Does" are the individuals on the Board of Directors and Committee during the Relevant Time Period.  The identities of the "Does" are unknown at this time and are named as "John Does" until the "Does" are known and can be named through an amendment to this Complaint.

40.     At all relevant times, Defendants Does 1-30, as members of the Board of Directors and/or Committee, were parties-in-interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets. Plaintiff reserves the right to amend the Complaint to name each of these John Does once Plaintiff ascertains their identities in discovery. The Committee and John Does 1-30 will be referred to collectively as the "Committee".

41.     Although not a defendant, the recordkeeper for the Plan retained by the Defendants during the Class Period (and as far back as 2010) and at all times relevant through approximately April 1, 2022, was Prudential Retirement Insurance and Annuity Company ("Prudential"). Effective on or about April 1, 2022, Empower Retirement, LLC ("Empower") acquired the retirement business of Prudential and became the recordkeeper for the Plan. Prudential and Empower are collectively referred to herein as the recordkeeper.

## VI.     STANDING

42.     ERISA permits an individual participant in a retirement savings plan to initiate litigation on behalf of the plan and other participants. 29 U.S.C. § 1132(a)(2) (allowing for "a participant" to bring a civil action "for appropriate relief" under ERISA); *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985) (explaining the purpose of the ERISA enforcement statute and describing "Congress' intent that actions for breach

of fiduciary duty be brought in a representative capacity on behalf of the plan as a whole"). Generally, a plaintiff has the standing to bring an ERISA claim where the plaintiff alleges a causal connection between defendants' actions and actual harm to an ERISA Plan in which the plaintiff participates. See *LaRue v. DeWolff, Boberg & Associates, Inc*., 552 U.S. 248, 256, 128 S. Ct. 1020, 169 L. Ed. 2d 847 (2008) (recognizing that § 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries").

43.     Claims under ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), are brought in a representative capacity on behalf of the Plan. As explained in detail within this complaint, the Plan suffered millions of dollars in losses traceable to Defendants' fiduciary breaches and remains exposed to harm and continued future losses.

44.     As of December 31, 2022, the Plan reported to have 9,433 participants with account balances and $518,710,871 in assets.

45.     At all relevant times, Plaintiff is and was a participant in the Plan as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Therefore, Plaintiff has statutory standing to bring claims under ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2), (3).

46.     Plaintiff also has constitutional standing under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) because Plaintiff personally suffered concrete and particularized injuries in many ways, including but not limited to, the Defendants selecting and/or allowing imprudent investment options in the Plan, failing to monitor and control recordkeeping and administrative expenses, unreasonably funding the PEA and using the monies to benefit Defendants and third parties at the expense of the participants, and allowing third parties to keep investment returns on the PEA and float income that should be returned to participants.

47.     Defendants are liable to the Plan to make good the Plan's losses under 29 U.S.C. § 1109(a).

## VII.    TIMELINESS

48.     Under ERISA § 413, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation."

49.     Plaintiff has participated in the Plan since approximately August of 2005, and is still a participant in the Plan.

## VIII.   DEFINITIONS AND ERISA PROVISIONS

50.     ERISA defines a "fiduciary" as a person (1) who exercises discretionary authority or control respecting management of the plan or management or disposition of plan assets; (2) who renders or has the authority or responsibility to render investment advice for compensation regarding money or property of the plan; or (3) who has discretionary authority or responsibility in the administration of the plan. 29 U.S.C. 1002(21)(A). The term "party in interest" includes, inter alia, any fiduciary, counsel, or employee of a plan; a person providing services to the plan; an employer or employee organization any of whose employees or members are covered by the plan; a corporation or other entity that is owned by such a person; an employee, officer, or director of, or owner of a specified financial interest in, such a person; and a partner or joint venturer of such a person. 29 U.S.C. 1002(14).  Subsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted; [s]ubsection three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised.

51.     An ERISA fiduciary also has a duty of prudence, which requires that the fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id*. § 1104(a)(1)(B).

52.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), also imposes a prudent person standard by which to measure fiduciaries' investment decisions and disposition of assets. The prudent person standard in ERISA requires a continuing duty to monitor Plan investments and Plan service providers and remove imprudent ones.  Such duty exists separate and apart from the fiduciary's duty to exercise prudence in selecting investments and service providers.

53.     These fiduciary duties are the highest known to the law.

54.     The legal construction of an ERISA fiduciary's duties is derived from the common law of trusts. Therefore, in determining the contours of an ERISA fiduciary's duty, this Court should look to the law of trusts.

55.     ERISA recognizes co-fiduciaries and related liability. ERISA § 405(a), 29 U.S.C. § 1105(a), titled "Liability for Breach by Co-Fiduciary," provides, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1)[, 29 U.S.C. § 1104(a)(1),] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances

to remedy the breach.

56.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, and other equitable relief.

57.     Wasting the trust's money (i.e., participants/beneficiaries' salary savings) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1). In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7.

## IX.     FACTUAL ALLEGATIONS

### A. DEFENDANTS ARE HARMING PARTICIPANTS BY USING PARTICIPANTS' ASSETS TO PAY EXCESSIVE RECORDKEEPING FEES.

58.     Every defined contribution plan must pay for recordkeeping services, which tend to be a largely automated service that can easily be provided at a relatively low fixed cost per participant in a qualified retirement plan. The cost of recordkeeping for an individual plan participant is, and should be, a relatively flat cost that is unrelated to the value of an individual plan participant's assets in the plan. Unfortunately, as is the case here, if retirement plan fiduciaries do not have a prudent process in place to monitor and control recordkeeping expenses, the charges passed on to a plan and its participants can be excessive and cause a substantial wasting of participants' hard-earned savings.

59.     Defendants have a duty to prudently select covered service providers ("CSPs"), such as recordkeepers. The failure to exercise due care in selecting a plan's service providers constitutes a breach of a trustees' fiduciary duty.  All services must be necessary for the Plan's operation and the expenses reasonable.

60.     Throughout the Class Period, Defendants have shielded from participants the true and total amounts being paid by participants and the Plan for recordkeeping. Defendants have done this by entering into complicated and hidden compensation agreements with service providers and other third parties that impose inflated fees on certain investments as part of complex revenue schemes that are neither fair nor adequately disclosed to participants, and which are disguised even in the Plan Form 5500s filed by the Plan fiduciaries.

61.     Piecing together information that has been revealed in Defendants' Plan Form 5500 data, the Plan's average recordkeeping costs are calculated to be at least $60 per year per participant from 2018 through 2022.  This is a conservative estimate; the total amount is likely much greater but can only be fully discerned through discovery. Even $60 per person, however, greatly exceeds comparable size plans with similar number of participants providing the same or similar service.

62.     In 2023, Defendants entered into a revised recordkeeping agreement with Empower, but the ultimate costs to participants appear to be just as egregious if not worse, due to the ongoing revenue sharing arrangements and Defendants' decision to use excess revenue to fund the PEA.

63.     In addition to the excessive cost paid per participant, Defendants breached their fiduciary duty of prudence by having a flawed process, if any, to identify and terminate the excessively high recordkeeping costs being paid year after year. Even with a change to the service agreement for recordkeeping in recent years, the Plan and participants have continued to pay unreasonable and unnecessary amounts to third parties.

64.     The greatest cost incurred in incorporating a new retirement plan into a recordkeeper's system is for upfront setup costs. After the Plan account is set up, individual

accounts are opened by entering the participant's name, age, SSN, date of hire and marital status. The system also records the amount a participant wishes to contribute each pay period through automated payroll deductions. Participants can go on-line and change their contribution rate at any time.

65.     Recordkeepers for defined contribution plans are generally compensated in two ways: First, through direct payments from the plan (participants) or employer; and second, through indirect payments via a practice known as revenue sharing.

66.     Revenue sharing arrangements inflate the fees paid by participants of some or all investments in the plan and then pay or allocate a portion of those inflated costs to the service providers as compensation for their services.  Because the revenue sharing model is asset-based (i.e., the participant pays a percentage of the value of that investment held in his or her account, but that percentage is typically not revealed to the participant), it cloaks from participants the actual and total amount of recordkeeping fees they are paying.

67.     Because the amount of asset-based revenue sharing fees paid by participants increases as their account value increases (whether by contributions or by earnings), fiduciaries must monitor the total amount of revenue sharing paid to ensure that the recordkeeper is not receiving unreasonable compensation.

68.     A prudent fiduciary either refuses to participate in revenue sharing, or at a minimum, ensures that the recordkeeper promptly rebates to the plan all revenue sharing payments that exceed a reasonable per participant recordkeeping fee that can be obtained in the recordkeeping market through competitive bids.

69.     A study in 2011 on 401(k) plans by the Government Accountability Office (GAO) suggests that due to plan sponsors' and participants' lack of understanding of indirect fees (revenue

sharing), recordkeepers may collect more revenue in the presence of indirect compensation and participants may pay higher fees in these plans. Additionally, if recordkeepers are better off when they receive compensation indirectly, they may influence 401(k) sponsors to include and subsequently keep certain investment options on the menu that pay a higher rebate, even when these options are detrimental to participants. Therefore, revenue sharing may also impose costs on participants through its effect on the menu design.

70.     Based on Form 5500 filings, the chart below compares average recordkeeping costs from 2018-2022 paid by comparable plans with a similar number of participants to those in the Plan, and/or similar amounts of plan assets, with the average (conservatively calculated) costs paid by the Plan.

| Sponsor | Recordkeeper | Avg Total Plan Assets | Avg Participants: With Balance at Year End | Avg Recordkeeping Fees Per Participant | Avg Total Recordkeeper Fees Per Year |
|---|---|---|---|---|---|
| AMERICAN WOODMARK CORPORATION | NEWPORT GROUP | 251,585,400 | 7,890 | 37 | 297,625 |
| Edward-Elmhurst Healthcare Retirement Plan | Fidelity | 869,130,906 | 10,891 | 35 | 378,506 |
| Children's Medical Center of Dallas 403(b) Employee Savings Plan | Fidelity | 400,902,967 | 10,024 | 35 | 351,476 |
| PILGRIM'S PRIDE RETIREMENT SAVINGS PLAN | GREAT-WEST | 244,397,581 | 19,274 | 26 | 459,696 |
| SUTTER HEALTH | FIDELITY | 168,726,173 | 6,415 | 24 | 157,856 |

| | | | | | |
|---|---|---|---|---|---|
| RETIREMENT INCOME PLAN | | | | | |
| DOLLAR GENERAL CORP 401(K) SAVINGS AND RETIREMENT PLAN | VOYA | 529,575,200 | 23,270 | 39 | 913,825 |
| **84 LUMBER COMPANY** | **PRUDENTIAL** | **429,000,000** | **8,709** | **60** | **514,000** |

71.     Retirement plan recordkeepers primarily differentiate themselves based on service and price, and vigorously compete for business by offering the best service for the best price.

72.     The package of recordkeeping services the Plan received included basic, standard recordkeeping services such as: government reporting services, plan sponsor support services, recordkeeping services, and plan investment services and reporting.

73.     The Plan did not receive any unique services or at a level of quality that would warrant fees greater than the competitive fees that would be offered by other providers.

74.     There are numerous recordkeepers in the marketplace (including Fidelity, Newport Group, Voya and Great-West as indicated in the chart above) who are capable of providing a high level of service to the Plan, and who will readily respond to a request for proposal and be able to perform the same recordkeeping functions for the Plan as Prudential, but at a substantially lower price.

75.     Thus, as demonstrated above, the Plan's fiduciaries imprudently permitted the Plan to pay recordkeeping costs to Prudential that were *two or more times* the amount charged to similarly situated plans, on a per-participant basis.

76.     Defendants obscured the true cost to participants of the recordkeeping services by entering into revenue-sharing agreements with Prudential and/or the investment companies that offer mutual funds and other investment options to the Plan. These revenue-sharing agreements are not shared with participants or publicly disclosed.

77.      Defendant's use of higher cost share classes and investment options   for recordkeeping is the most inequitable, inefficient, and expensive method available.

78.     Upon information and belief, the Defendants failed to timely issue Requests for Proposals ("RFPs") to solicit lower price bids for the Plan's recordkeeping and administrative services. It is well recognized that RFPs result in lower costs being incurred for recordkeeping and administrative services.

79.     In addition to failing to engage in the RFP process, Defendants further failed to take adequate, or any, action to properly monitor, evaluate or reduce their excessive service provider fees, such as (1) choosing mutual fund share classes with lower fees and revenue sharing for the Plan; (2) monitoring recordkeeping costs to compare with the costs being charged for similar sized plans in the marketplace; or (3) negotiating to cap the amount of revenue sharing or ensure that any excessive amounts were returned to the Plan and promptly allocated to participants.

80.     When compared to Plans with similar size, participants and services, the data indicates a flawed process in monitoring the Plan recordkeeper to ensure excessive fees were not paid by participants.

81.     As a result of Defendants' imprudent manner of obtaining the necessary recordkeeping services for the Plan, the Plan participants were harmed by the loss of millions of dollars.

82.     Defendants may argue that the imprudent selection of the high-fee funds discussed below is defensible because of the revenue-sharing arrangement, but that argument is specious because, as shown, the revenue-sharing paid for excessive recordkeeping costs. Further, the asset-based charges are inequitable and caused participants to lose earnings on their investments. The participants would have been better off being charged a flat, openly disclosed fee in lieu of the revenue-sharing agreements entered into and allowed to persist by Defendants.

**B. DEFENDANTS FAILED TO PRUDENTLY SELECT AND MONITOR FUNDS, FUND MANAGERS, AND COVERED SERVICE PROVIDERS.**

83.     An ERISA fiduciary has a continuing duty to monitor plan investments and remove imprudent ones.

84.     An ERISA fiduciary's evaluation of Plan investments must be focused solely on economic considerations that have a material effect on the risk and return of an investment based on appropriate investment horizons, consistent with the Plan's funding policy and IPS.

85.     Plan fiduciaries must "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments. Restatement (Third) of Trusts Ch. 17, intro. note (2007); see also Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").

86.     Adherence to these duties requires a fiduciary to regularly conduct adequate investigations of existing investments in a plan to determine whether any of the plan's investments are charging unwarranted costs or are otherwise improvident in comparison to available alternatives.

87.     An examination of the cost and fee structure of the Plan shows that the Committee did not have and/or did not utilize a viable methodology for monitoring or controlling the costs

and expenses of the Plan's investment options, or for monitoring and replacing investments, and as a result, the Plan contained imprudent investment options during the Class Period.

88.     The Restatement, the UPIA, and ERISA's prudent expert standards required the Committee to have and utilize a prudent methodology for ensuring participants' money was not wasted.

89.     As described below, the Committee failed to demonstrate the competence, skill, effort, and diligence required of a prudent fiduciary.

90.     Defendants violated their fiduciary obligations by selecting and retaining overly expensive, underperforming investment options.

91.     As set forth above, Defendants paid for record keeping via asset-based assessments imposed upon the Plan participants.  This is not only inequitable, but it hides from participants the amount actually being paid for such services as compared to a quarterly fee amount that has a related transaction description that participants can see on their Plan's website and each quarterly statement.

92.     As explained in more detail below, Defendants violated their fiduciary obligations by permitting the Plan to retain higher cost, lower yielding, share classes or other investment options, when cheaper, better performing, identical[4] ones were readily available. Defendants' chosen funds' SEC-prospectuses (at www.sec.gov/edgar) waived minimum purchase amounts for "qualified retirement plans" (QRP) and "omnibus trusts," and thus, there was no proper reason to not select the less expensive share classes for the Plan.

---

[4] The word "identical," when used contextually in a sentence about mutual funds, means of the same RIC (registered investment company), and the same manager, same fund holdings, etc. The only difference lies with the share classes or fund's expense ratio.

93.     Defendants' violations resulted from their failure to adopt, utilize and/or follow prudent processes in managing the Plan.

94.     In analyzing the conduct of fiduciaries, courts "focus not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction." *Tibble v. Edison Int'l* (*Tibble III*), 843 F.3d 1187 (9th Cir. 2016) (en banc) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).

95.     The prudence analysis focuses on the "fiduciary's conduct in arriving at an investment decision, not on its results." *Id*. A thorough investigation requires "a reasoned decision-making process." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (internal quotations omitted).

96.     In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan less expenses. *See* 29 U.S.C. §1002(34). Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor.

97.     Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees and performance compound, and can result in vast differences in the amount of savings available at retirement. Thus, violations and damages continue over time.

98.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year

period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[5]

99.     "As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively. Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time. A trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International*, 843 F.3d 1187, 1198 (9th Cir. 2016).

100.    Defendants had tremendous bargaining power to demand low-cost recordkeeping services and well-performing, low-cost investments.  All the disputed funds' SEC-prospectuses waived "initial purchase minimums for omnibus trusts/QRPs."

101.    Defendants had a deficient process for selecting, evaluating and monitoring funds as shown by the fact that funds with unreasonably high expenses remained in the Plan during the Class Period, rather than the lower cost, but otherwise identical alternative share classes of the funds or collective investment trusts that also offered higher returns.

---

[5] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/401kFeesEmployee.pdf

102.    The mutual funds' excessive fees significantly reduce fund net asset values (NAVs) or prices each day and these costs affect all future returns to the trust investment (from reduced recurring dividends/interest).

103.    Despite Plaintiff's pre-suit requests under ERISA §104(b), Defendants failed to disclose each mutual fund's "selling agreements," which would have illuminated how the management fees for all the Plan's investment options were structured and/or utilized.

104.    The Defendants repeatedly failed to act solely and exclusively for the benefit of participants by selecting and retaining investments in the Plan not because they merited inclusion (after a thorough investigation), but rather, because the chosen investments would charge participants unreasonable fees that Defendants could then direct toward the covered service providers and/or be used to the benefit of the Company by funding a Participant Expense Account ("PEA") that the Company uses to pay costs that the Company otherwise would bear.

105.    Defendants failed to ensure that the fees being collected were fair and reasonable and used only for necessary and reasonable expenses.

## C. DEFENDANTS FAILED TO COMPLY WITH THE PLAN'S INVESTMENT POLICY STATEMENT.

106.    ERISA obligates fiduciaries to comply with all plan documents unless the documents run afoul of the fiduciaries' obligations under ERISA.

107.    An Investment Policy Statement ("IPS") is a plan document. *See* 29 CFR § 2509.2016–01(2) ("Statements of investment policy issued by a named fiduciary … would be part of the 'documents and instruments governing the plan' within the meaning of ERISA section 404(a)(1)(D).").

108.    The purpose of an IPS, among other things, is to set forth procedures, rules, factors and criteria for plan fiduciaries to consult, utilize and apply when evaluating funds offered by, or being considered as investment options in, a plan.

109.    Failing to adhere to the procedures and processes set forth in an IPS is a breach of fiduciary duty. However, merely complying with an IPS does not shield a fiduciary from liability for otherwise failing to comply with its obligations under ERISA.

110.    The IPS for the Plan expressly states that it "outlines the underlying philosophies and processes for the selection, periodic monitoring and evaluation of the investment options offered by the Plan." IPS, Part II. ("THE PURPOSE OF THE INVESTMENT POLICY STATEMENT").

111.    The IPS expressly states that it "[d]escribes the criteria and procedures for selecting the investment options"— although not the "sole factors considered" — and establishes investment procedures, measurement standards and monitoring procedures for the Committee. *Id.*

112.    The IPS provides:

**Part III. INVESTMENT OBJECTIVES**

The Committee will select the Plan's investment options based on criteria deemed relevant, from time to time, by the Committee. These criteria may include, but are not limited to, the following:

*1.* **Maximization of return within reasonable and prudent levels of risk.**
*2.* Provision of returns comparable to returns for similar investment options.
*3.* Provision of exposure to a wide range of investment opportunities in various asset classes and vehicles.
*4.* **Control of administrative and management fees.**
*5.* Provision of appropriate diversification within investment vehicles.
*6.* Investment's adherence to stated investment objectives and style.

IPS, p.2 (emphasis added).

113.     The IPS further provides a "Scorecard System Methodology Active Strategies" section for the fiduciaries to utilize in evaluating actively managed funds. *See* IPS, p. 11. The factors in this section include: "Style Analysis" "Style Drift" "Risk/Return" "Up/Down Capture Analysis" "Information Ratio" and "Qualitative Factors".

114.     The IPS further provides, with respect to "Qualitative Factors" to be considered when evaluating an investment option, that "[p]rimary considerations are given to *manager tenure, fund expenses and strength of statistics*, however, other significant factors may be considered. It is important to take into account nonquantitative factors, which may impact future performance." IPS, p.11 (emphasis added).

115.     In addition, pursuant to Part VII of the IPS, "ongoing monitoring of investments is a regular and disciplined process intended to ensure that a previously selected investment option continues to satisfy the selection process and that an investment option continues to be a prudent option offered for investment in the Plan." It continues, "[m]onitoring will generally utilize the same investment selection criteria used in the original selection analysis or such other criteria as deemed prudent by the Committee."

116.     As evident by the investment options that remained in the Plan throughout the Class Period, and the excessive recordkeeping fees paid, the Defendants wholly failed to implement or utilize a prudent process as prescribed by the IPS.

//

//

//

## X. SPECIFIC FUND ANALYSES

### A. DEFENDANTS IMPRUDENTLY SELECTED AND RETAINED THE T. ROWE PRICE TARGET DATE FUNDS THROUGHOUT THE CLASS PERIOD.

117.    A CIT is a collective investment trust administered by banks or trust companies, which, like a mutual fund, assembles a mix of assets such as stocks, bonds, and cash.

118.    CITs are regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission and have lower or no administrative costs because they have simple disclosure requirements and cannot advertise or issue formal prospectuses.

119.    Defendants violated their duty of prudence in selecting and retaining the unreasonably expensive mutual fund version of the T. Rowe Price Target Date Funds ("TDFs") in the Plan instead of the essentially identical, but significantly cheaper, collective investment trust ("CIT") version of the TDFs which were available as early as 2013, which was years before the start of the Class period.

120.    The CIT is a proper comparator for the mutual fund version of the TDFs.  The mutual fund and CIT versions of the TDFs are similar in every way except the cost.

121.    The same managers (Lee, DeDominicis) manage both the CIT version and the mutual fund version of the TDFs using the same holdings. The investments both have the same aims, risks, rewards, and characteristics.  Significantly, the CIT version **costs up to 42 basis points less per year**.

122.    Participants, such as Plaintiff, who invested in the mutual fund TDFs were harmed by the Plan not offering and selecting the CIT versions of the TDFs which provided lower costs and higher returns (as supported by the data below). This shows a flawed process by Defendants in the selection, retention and monitoring of Plan funds.

123.     As required by the SEC, all mutual funds must file and maintain a fund prospectus. The prospectus describes the mutual fund to prospective investors. The prospectus contains information about the mutual fund's costs, investment objectives, risks, and performance. These are readily available on a government website located at https://www.sec.gov/edgar/searchedgar/prospectus.

124.     A prospectus contains important information about a fund's fees and expenses, investment objectives, strategies, risks, performance, pricing, and more.

125.     Defendants chose and/or retained the mutual fund version of the TDFs which charged fees **up to 72 basis points** a year versus the CIT version of the TDFs which charged **just 30 basis points**.

126.     As shown in the table below, Defendants' actions resulted in unnecessary and unreasonable costs to the Plan and the participants.

//

//

//

//

//

//

//

//

//

//

//

| T Rowe Price TDF in the Plan | Expense Ratio | T Rowe Price TDF CIT - Lower Cost | Expense Ratio of CIT TDF | Excess % Charged | Year |
|---|---|---|---|---|---|
| | | | | | 2019 |
| T Rowe Price Retirement 2010 | 0.53% | T Rowe Price Retirement 2010 CIT | 0.30% | 56.60% | |
| T Rowe Price Retirement 2020 | 0.59% | T Rowe Price Retirement 2020 CIT | 0.30% | 50.85% | |
| T Rowe Price Retirement 2030 | 0.66% | T Rowe Price Retirement 2030 CIT | 0.30% | 45.45% | |
| T Rowe Price Retirement 2040 | 0.70% | T Rowe Price Retirement 2040 CIT | 0.30% | 42.86% | |
| T Rowe Price Retirement 2050 | 0.71% | T Rowe Price Retirement 2050 CIT | 0.30% | 42.25% | |
| T Rowe Price Retirement 2060 | 0.72% | T Rowe Price Retirement 2060 CIT | 0.30% | 41.67% | |
| | | | | 46.61% Average | |
| | | | | | 2020 |
| T Rowe Price Retirement 2010 | 0.52% | T Rowe Price Retirement 2010 CIT | 0.30% | 57.69% | |
| T Rowe Price Retirement 2020 | 0.57% | T Rowe Price Retirement 2020 CIT | 0.30% | 52.63% | |
| T Rowe Price Retirement 2030 | 0.64% | T Rowe Price Retirement 2030CIT | 0.30% | 46.88% | |
| T Rowe Price Retirement 2040 | 0.69% | T Rowe Price Retirement 2040 CIT | 0.30% | 43.48% | |
| T Rowe Price Retirement 2050 | 0.71% | T Rowe Price Retirement 2050 CIT | 0.30% | 42.25% | |
| T Rowe Price Retirement 2060 | 0.72% | T Rowe Price Retirement 2060 CIT | 0.30% | 41.67% | |
| | | | | 47.43% Average | |
| | | | | | 2021 |
| T Rowe Price Retirement 2010 | 0.52% | T Rowe Price Retirement 2010 CIT | 0.30% | 57.69% | |
| T Rowe Price Retirement 2020 | 0.56% | T Rowe Price Retirement 2020 CIT | 0.30% | 53.57% | |
| T Rowe Price Retirement 2030 | 0.63% | T Rowe Price Retirement 2030 CIT | 0.30% | 47.62% | |
| T Rowe Price Retirement 2040 | 0.68% | T Rowe Price Retirement 2040 CIT | 0.30% | 44.12% | |
| T Rowe Price Retirement 2050 | 0.70% | T Rowe Price Retirement 2050 CIT | 0.30% | 42.86% | |
| T Rowe Price Retirement 2060 | 0.71% | T Rowe Price Retirement 2060 CIT | 0.30% | 42.25% | |
| | | | | 48.02% Average | |
| | | | | | 2022 |
| T Rowe Price Retirement 2010 | 0.49% | T Rowe Price Retirement 2010 CIT | 0.30% | 61.22% | |
| T Rowe Price Retirement 2020 | 0.53% | T Rowe Price Retirement 2020 CIT | 0.30% | 56.60% | |
| T Rowe Price Retirement 2030 | 0.58% | T Rowe Price Retirement 2030 CIT | 0.30% | 51.72% | |
| T Rowe Price Retirement 2040 | 0.60% | T Rowe Price Retirement 2040 CIT | 0.30% | 50.00% | |
| T Rowe Price Retirement 2050 | 0.63% | T Rowe Price Retirement 2050 CIT | 0.30% | 47.62% | |
| T Rowe Price Retirement 2060 | 0.64% | T Rowe Price Retirement 2060 CIT | 0.30% | 46.88% | |
| | | | | 52.34% Average | |

127.   Prices of mutual funds are reduced by fund fees every day. Open-end management

investment companies' mutual fund expenses are deducted daily at 4 pm from each fund's GAV

(gross asset value) price to arrive at the participants'/beneficiaries' allocated NAV (net-asset value). That means Plan assets are eroded every day by excess fees, which reduces the returns on the investment.

128.    On any review, the Defendants should have recognized that the mutual fund TDFs had a total return that was consistently and significantly less than the equivalent CIT version, which was readily and easily available to the Plan had the Defendants chosen to act.

129.    The Defendants held these TDF funds since well before the Class period so monitoring failures occurred over the course of many years.

130.    This is direct evidence of impudent conduct because it was not in the participants' best interests. A reasonable and prudent fiduciary would not have selected the higher cost TDF funds when a cheaper, equivalent version was available at the time of the conduct.

131.    The Defendants apparently chose the above funds because all of them had revenue sharing available, which is paid for by fees taken from these funds' daily NAV. The amount of revenue sharing varies from one mutual fund to another.

132.    Revenue sharing does not justify Defendants' actions. The challenged funds' total return and yields were depleted by *more than the purported revenue sharing credits*. That is, the lost opportunity costs were much greater than the short-term misguided goals of the Defendants. Simple mathematical reasoning was never used by these Defendants.

133.    Any revenue sharing credit that may eventually make it to the responsible "paying participant" is (1) missing the compounding of earnings, and (2) conditioned as to whether the Plan's fiduciaries have agreements and processes in place for full revenue sharing credit back to affected participants.

134.    Defendants failed to provide documents to Plaintiff in response to her pre-suit request under ERISA §104(b), that would show the transaction history for the PEA, which Defendants are funding with proceeds generated by revenue sharing.  Such information would shed light on how Defendants have been spending and utilizing these substantial assets of the Plan/participants.

135.    Regardless, Defendants' actions in regard to the TDF funds cannot be justified. The precise damages figure will be calculated when specific Plan information is received during discovery.

**B.  DEFENDANTS IMPRUDENTLY SELECTED AND RETAINED THE MORE EXPENSIVE, LOWER PERFORMING SHARE CLASSES OF THE FUNDS IN THE PLAN.**

136.    Under ERISA's "sole and exclusive" rule, an easy choice for fiduciaries after investigating and hiring a skilled fund manager is picking the most beneficial share class.

137.    A fund prospectus lists all share classes of a fund on the same page. For example, the Victory Sycamore Established Value Fund ("Sycamore" fund), lists the Class A, Class C, Class I, Class R, Class R6, and Class Y shares with their ticker symbols on the cover page of the prospectus, along with information such as their expenses ratios and performance. The same holds true for the other mutual funds in the Plan.

138.    For the Sycamore fund, the ticker symbols for the share classes are: VETAX, VEVCX, VEVIX, GETGX, VEVRX, VEVYX.

139.    All of the Sycamore share classes were incepted before the Class Period, and thus were available for the Plan had the Defendants wanted.

140.    Defendants selected and/or retained the Victory Sycamore share class A for the Plan throughout the Class Period. At all times during the Class Period, there were two identical

funds with cheaper, better performing share classes they could have selected. The returns and the lower expenses for share classes "I" and "R6" were much more favorable than Class A, yet they were ignored by Defendants.

141.    The below chart, using 2018 data, shows that the A shares and R6 shares are identical investments:

| Name (2018 data) | Fund Manager | Fund ID | Manager Start Date | # Stocks | Average Price/Earnings Ratio | % US Stocks | % Non-US Stocks | % Cash |
|---|---|---|---|---|---|---|---|---|
| **Victory Sycamore Established Value A** | **Miller, Conners, Graff, Albers** | 0C000033Y0 | 7/31/98 | 74 | 19.67 | 96.25 | 1.45 | 2.3 |
| **Victory Sycamore Established Value R6** | **Miller, Conners, Graff, Albers** | 0C000033Y0 | 7/31/98 | 74 | 19.67 | 96.25 | 1.45 | 2.3 |

142.    The only difference between any of the different share classes of a fund is the expense ratio, which also impacts the performance to an even greater degree.

143.    By way of example of Defendants' failure to prudently monitor the Plan investments during the Class Period, they would have seen the below data in 2019:

| Name (2019 data) | Expense Ratio | Yield 12-Month | Number of Holdings |
|---|---|---|---|
| **Victory Sycamore Established Value A** | 0.89 | 1.03 | 78 |
| **Victory Sycamore Established Value R6** | 0.57 | 1.33 | 78 |

144.    The R6 share class inception date was March 4, 2014. Back in 2018, had the Defendants compared the A shares to the R6 shares over the prior 4 years, they would have seen,

as shown in the table below, that the A shares' annual returns each year continually and consistently lagged behind the returns of the cheaper R6 class:

Annual % Returns Each Year

| Name | 2018 | 2017 | 2016 | 2015 | True No-Load | Telephone Switch | Toll-Free Number |
|---|---|---|---|---|---|---|---|
| Victory Sycamore Established Value A | 1.23 | 15.66 | 20.66 | 0.68 | N | Y | 800 539-3863 |
| Victory Sycamore Established Value R6 | 1.41 | 16.08 | 21.11 | 1.03 | Y | Y | 800 539-3863 |

145.    The prospectus in 2018 stated that a telephone switch was available with no minimum purchase requirement. Thus, the Committee's members could have requested a switch from the loaded A class to the no-load R6 at any time.

146.    All of the data necessary for the Defendants to make an informed and prudent decision was at all times available. By further example, had the Defendants employed a prudent process and looked at the prospectus for the Sycamore fund in 2018, they would have seen that the returns for 1 year, 3 years, and 5 years compelled choosing the I class (which was incepted in 2010) over the A class.  Further, while the "Information Ratios" ("IR") are unfavorable for all share classes of this fund (which suggests that another fund should have been considered entirely), the higher IRs for the I class further show that the I class was a better choice. The following table reflects this:

| | | Prospectus data as of 3/31/2018 | | | | | |
|---|---|---|---|---|---|---|---|
| Name | Symbol | 3-Year Total Returns | 5-Year Total Returns | Yield 12-Month | Information Ratio 1-year | Information Ratio 3-year | Information Ratio 5-year |
| Victory Sycamore Established Value A | VETAX | 37.62 | 88.69 | 0.7 | -0.74 | -0.14 | 0.03 |
| Victory Sycamore Established Value I | VEVIX | 38.84 | 91.78 | 0.98 | -0.67 | -0.08 | 0.11 |

147.    As can be seen by doing the math in the 5-year total returns of 88.69 for the A class versus 91.78 for the I class, the difference is 3.09 (or 0.62% per year). In other words, failure to give the participants the cheaper shares class cost them an average of 62 basis points in returns for each of the prior five years. This greatly exceeds the "revenue sharing" credited or paid by the funds.

148.    The same analysis and calculus holds true for all the funds in the Plan where the Defendants imprudently selected the more expensive share classes. The missed returns are greater than the revenue-sharing credits the Defendants may argue were the reason for maintaining the more expensive share classes. This is simple math.

149.    Based on the participants' savings invested in just the Sycamore fund during the Class Period, the additional costs paid by the participants due to the Defendant's failure to choose the "R6" shares over the "A" shares exceeded $260,000, but the lost returns exceeded $1.28 million.

150.    Defendants have maintained the Class A shares with a current expense ratio of .90% instead of Class I with an expense ratio of .58% or Class R6 with an expense ratio of .54%.

151.    Defendants' flawed behavior and decision-making impacted all of the funds in the Plan where Defendants' selected the more expensive share classes over the cheaper, better performing alternative classes. This common behavior, which also includes selecting and maintaining the more expensive and worse performing mutual fund version of the TDFs over the cheaper, better, CIT version, caused the Plan and participants to suffer millions of dollars of losses. Accordingly, Plaintiff challenges the inclusion of all of those investment options in the Plan during the Class Period.

## C.  DEFENDANTS' ACTIONS SHOW THE LACK OF A PRUDENT PROCESS.

152.    Plaintiff does not contend that Defendants needed to scour the market to find the cheapest funds available. There was no need to "scour" the market because the facts are overwhelming that the same higher cost funds selected/retained by the Defendants: (1) appear on the same pages of their respective prospectuses at the SEC's website, and (2) a cheaper share class or alternative, such as the CITs, was always available at the time of the Defendants' conduct. *Kruger, et al. v. Health, Inc*., 131 F.Supp.3d 470, 476 (M.D.N.C. 2015) ("Plaintiff are not arguing that Defendants had a duty to scour the market to find and offer any cheaper investment. Instead, Plaintiff allege that 'lower-cost funds with the identical managers, investments styles, and stocks' should have been considered by the Plan.").

153.    In the *Tibble v. Edison Int'l* line of cases, the district court ultimately recognized that the "decision to invest in retail-class shares instead of institutional-class shares of the same fund violated [the] duty of prudence." *Tibble v. Edison Int'l*, 2017 WL 3523737 (C.D. Cal. Aug. 16, 2017).

154.    All alternative share classes and investment options could have been purchased by the Defendants without meeting any minimum amount of assets.

**D. DEFENDANTS IMPRUDENTLY MAINTAINED THE PRUDENTIAL PRINCIPAL PRESERVATION SEPARATE ACCOUNT IN THE PLAN AS THE STABLE VALUE FUND.**

155.    During the Class Period through the present, the Defendants have offered the Prudential Principal Preservation Separate Account ("PPSA") as the stable value fund option in the Plan.

156.    A stable value fund in a retirement plan is (i) similar to a money market fund in that it provides principal protection, and (ii) similar to a bond fund in that it provides higher consistent returns over time. Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by ensuring the fund transacts at book value.

157.    Stable value accounts are not SEC registered mutual funds nor are they bank products. They are typically single company fixed annuity contracts that are structured as an insurance company general account, or an insurance company separate account, and are solely regulated by the State Insurance Commissioner selected by the insurance company.

158.    PPSA is a group annuity product issued by Empower Annuity Insurance Company ("EAIC"), an affiliate of Empower. Because of the automatic allocation among investment options performed by the GoalMaker service in the Plan, Plaintiff has had more than 15% of her retirement savings in the Plan automatically invested in the PPSA.

159.    Because the GoalMaker allocation is the qualified default investment alternative ("QDIA") for the Plan, and because allocations to the PPSA increase for participants as they move closer to retirement age, substantial assets in the Plan get invested in the PPSA by default.

160.    Empower earns revenue from the assets invested in the PPSA. Empower also charges participants a fee for using GoalMaker. Plaintiff challenges the Defendants' actions and inactions in allowing Empower to earn the amount of revenue it does from the PPSA and GoalMaker each year.

161.    Per the prospectus for PPSA, the Defendants are able to contract for a specified rate in advance that will apply for at least the next 6 month period. Defendants are failing to act prudently in selecting and negotiating the PPSA and its crediting rate to be paid. For example, Over the last year, the Defendants contracted with Empower to receive a crediting rate of just 1.8% for the assets invested in the PPSA.

162.    Empower represents that it is common to benchmark the PPSA "against various indices, which include … Money Markets and other fixed income indices." https://www.retirement.prudential.com/RSO/web/fundsheets/4D03-BD50-34A754FB24B8.PDF (last visited June 10, 2024).

163.    Accordingly, using comparable Money Market accounts readily available from other providers as a benchmark, the Defendants should see that the alternatives **pay nearly 3 times the** interest rate paid by the PPSA. For example, as of June 7, 2024, the current one year returns of the below Money Markets are:

| Market-rate Sweep Account | 1 Year Return |
|---|---|
| Vanguard Fed. MMkt. (VMFXX) | 5.39% |
| Dreyfus Govt. Cash Mgmt. (DGCXX) | 5.35% |
| Fidelity Govt. MMkt. (SPAXX) | 5.07% |

| Dreyfus Gen. MMkt. (GMMXX) | 5.08% |
|---|---|

164.    Because, as represented by Empower, the above funds can be used as a benchmark for the PPSA, it is clear that the PPSA is a critically underperforming and imprudent investment option and is causing the Plan and the participants to lose substantial earnings.

165.    The PPSA does not offer any services, benefits or features that differentiate it materially from the Money Markets alternatives, such as those listed above.

166.    Defendants' imprudent actions are causing Plaintiff and the participants to lose substantial earnings.

## XI.    DEFENDANTS BREACHED THEIR DUTIES

167.    As part of their fiduciary duties under ERISA, the Defendants at all times were obligated to comply with 29 CFR § 2550.404a-1 ("Investment Duties").

168.    These Investment Duties required Defendants to "give[]appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved." 29 CFR § 2550.404a-1(b)(1)(i).

169.    Among other things, the Defendants were required to make "[a] determination … that the particular investment or investment course of action is reasonably designed … to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks." *Id*. at § 2550.404a-1(b)(2)(i).

170.    Based on facts and circumstances prevailing at the time of their conduct, the Committee's members routinely violated ERISA. They failed to adhere to the terms of the Investment Policy Statement (IPS) as well as the UPIA and the Restatement.

## XII.    CLASS ALLEGATIONS

171.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following proposed class ("Class")[6]:

> All persons, except Defendants, and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between June 11, 2018 through the date of judgment (the "Class Period").

172.    The members of the Class are so numerous that joinder of all members is impractical. The 2022 Form 5500 lists 9,433 total participants with account balances in the Plan.

173.    Plaintiff's claims are typical of the claims of the members of the Class. Like other Class Members, Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' failure to comply with ERISA and mismanagement of the Plan. Defendants treated Plaintiff consistent with other Class Members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class Members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

174.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are/were fiduciaries of the Plan;

---

[6] Plaintiff reserves the right to propose other or additional classes or subclasses in a motion for class certification or subsequent pleadings in this action.

B.    Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

C.    Whether the Defendants are responsible for appointing other fiduciaries and failing to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

175.    Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

176.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

177.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
## VIOLATION OF 29 U.S.C. § 1104(a) and 1105(a)
### (Duty of Prudence)

178.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

179.    ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

180.    In determining whether an ERISA fiduciary breached its duty of prudence, courts focus on: "whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356-58 (4th Cir. 2014). *Accord Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014).

181.    In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523.

182.    At all relevant times, Defendants did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best interests of the Plan participants.

183.    Defendants breached their fiduciary duties in multiple respects. Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping and administrative services and had a flawed process for selecting and retaining investments and service providers.

184.     Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Instead, the Defendants selected and retained investment options in the Plan despite the unreasonably high cost of the options in relation to other identical or comparable investments. By doing so, Defendants benefited themselves at the expense of the Plan and the participants and wasted Plan assets.

185.     Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Defendants failed to have a proper system of review in place to ensure that: (a) participants in the Plan were being charged appropriate and reasonable fees by the Plan's service providers; (b) the selection and retention of investment options for the Plan were prudent; (c) that Plan expenses were reasonable and necessary; and (d) the Plan Expense Account was prudently funded and managed for the benefit of the Plan and the participants, used only for necessary and reasonable Plan expenses, and any balance was returned in a timely manner to participants in accordance with the Plan documents.

186.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered substantial losses.

187.     Had Defendants complied with their fiduciary obligations, the Plan and Plan participants would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

188.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.

189.    In addition, Plaintiff is entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in his Prayer for Relief.

## SECOND CAUSE OF ACTION
### Failure to Monitor Other Fiduciaries

190.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

191.    The Company had the authority to appoint and remove members of the Committee and other fiduciaries to the Plan.

192.    As the appointing/selecting fiduciaries, Company had a duty to monitor its appointees and providers it selected to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that they were not fulfilling those duties.

193.    Company also had a duty to ensure that its appointees and Plan service providers it selected and retained possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; and maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments.

194.    Company breached their fiduciary monitoring duties by, among other things:

a.    Failing to monitor and evaluate the performance of their appointees and Plan service providers, or have a system in place for doing so, paying excessive and unreasonable recordkeeping and administrative fees, and standing idly by as the Plan and Plan participants suffered significant losses as a result of their imprudent actions and omissions and wasting of Plan assets;

b.  Failing to monitor the processes by which Plan investments were evaluated, and failing to investigate and/or utilize lower-cost share classes and better-performing investment options;

c.  Failing to remove Committee members and service providers who were incompetent, who charged excessive fees, and/or whose performance was inadequate; and

d.  Failing to monitor and ensure that the Plan Expense Account was funded and managed appropriately and lawfully, failing to use the Plan Expense Account for the sole benefit of the participants, and failing to allocate the balance in the Plan Expense Account to participants in a timely manner in accordance with the Plan documents.

195.  As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered substantial losses.

## PRAYER FOR RELIEF

196.  Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests the Court:

a.  Certify the Class, appoint Plaintiff as class representative, and appoint undersigned counsel as Class Counsel;

b.  Find and declare that Defendants have breached their fiduciary duties as described above;

c.  Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

d.  Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

e.  Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

f.  Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

g.  Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

h.  Impose a surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

i.  Order Actual damages in the monetary amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

j.  Order equitable restitution against Defendants;

k.  Award to Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

l.  Order the payment of interest to the extent it is allowed by law; and

m.  Grant other equitable or remedial relief as the Court deems appropriate.

Dated:  June 11, 2024

/s/ Edwin J. Kilpela, Jr.
Edwin J, Kilpela, Jr., Esq.
Paige T. Noah, Esq.
**WADE KILPELA SLADE LLP**

6425 Living Place
Suite 200
Pittsburgh, PA 15206
Telephone: (412) 314-0515
Email: ekilpela@waykayslay.com
Email: pnoah@waykayslay.com


Peter A. Muhic, Esq. (admission pending)
**MUHIC LAW LLC**
923 Haddonfield Road
Suite 300
Cherry Hill, NJ 08002
Telephone: (856) 324-8252
Email: peter@muhiclaw.com


*Attorneys for Plaintiff and the Proposed
Class*